Mr. Justice Hagner
delivered the opinion of the court.
This is a bill filed by Mr. Schillinger, in his own name as patenteee, and by various co-plaintiffs, as assignees within the District of Columbia, of portions, amounting now in all to six-sevenths, of a patent.
The bill alleges that the defendant' Cranford had infringed these patent rights, and calls for an injunction and an accounting.
There is a large mass of testimony in the case which we have carefully examined. It discloses differences in statements of the witnesses of the opposing parties, both as to the. details of the process of laying the pavement used by Cranford, and also as to his purpose in following those details. Bjit the weight of the evidence shows that the mode in which Cranford lays his payment is substantially as follows: He prepares first what may be called the bed of the pavement, and then places parallel strips of plank diagonally from the curb across this bed of the pavement towards the houses fronting on the street. He then begins with the first subdivision formed by these boards and fills the space *457 between them with a mass of concrete, composed of Portland cement, sand, and some broken stone or other similar substance. Having done that he goes to the third subdivision in order, and the same process is repeated there. He then takes a large iron instrument called a cleaver, and drives it down a considerable distance, entirely through or nearly through the concrete mass so as to mark off these subdivisions into blocks. After that is done, be takes a different substance, not concrete, but composed of cement and sand, moistened and reduced to plastic form, and uses it as an additional or top coating over the concrete. This is spread on the subdivisions across which the cleaver has left these gaps, and then the whole surface is “rubbed down.” Necessarily portions of this last substance intrude themselves into the gaps. After that has been made perfectly smooth the workman takes a trowel and cuts through the top surface exactly in a line with the cuts below. Again that is smoothed over, and then what is called a “jointer ” is run in the same lines; and when this has been completed the pavement has the checkered or tassellated appearance of separate blocks. He repeats this process with the second and fourth subdivisions, and finishes the remaining subdivions alternately.
Then as to the motives with which he follows these details which I have described. The plaintiffs say that his purpose is to form separate blocks,, so that each can be taken up without injury to the adjacent blocks, and also to prevent the cracks which may occur in one block from running across continuously into the other blocks. And they say, as proof of their assertions, that the blocks which Cranford thus forms can be taken up separately, and have been so taken up ; and, also, that the proof shows that the cracks are controlled by the lines. Cranford admits that the effect of his method is to make the joints weak; but he denies that his purpose in making the cuts is to allow the taking up of blocks separately; and he further denies that in point of fact that they can be taken up separately; and he produces' exhibits to show, and some of his witnésses testify, that ef *458 forts repeatedly made to take up any one of the blocks without injuring the others proved abortive; and, again, that so far from the cracks having been controlled by the lines in the pavements laid by him, they run indiscriminately, at their own will, across the lines.
This is about the state of the proof .on this point; the principal conflict in the evidence being as to the motives of Cranford in following these details in the fabrication.
It has been much insisted on behalf of the complainants that this question has been so frequently answered in a manner favorable to their pretensions by several of the circuit and district courts of the United States, that it should be considered res judicata, and our.only course should be, upon the facts before ns, to acquiesce in those decisions and decide this case in their favor.
On the other side, we have have been referred to decisions of similar courts, which it is insisted by the defendant are inconsistent with those referred to by the complainants. This court, like other courts of the country, is charged with .the examination for itself of the questions involved in complaints of infringement; and the circumstance that to this court, located at the seat of government, is entrusted the exceptional. jurisdiction of determining appeals from the decrees of the Commissioner of Patents, may well be considered as imposing upon it a special duty of making such examinations with care, and of deciding only upon its own conviction of the merits of the ca^e.
This course we have pursued in similar cases, as in that of the Dental Vulcanite Company vs. Brightwell, Mac A. & Mackey, 74, where we were much pressed with the weight of a number of decisions in other circuit courts which had declared the use of celluloid to bfe an infringement of a previous patent; and especially to the ruling to that effect in the District of Maryland nearest to the seat of our jurisdiction. But we felt constrained to decide otherwise upon a careful examination of the case, and that ruling was after-wards decided by the Supreme Court of the United States, in a similar case, to be correct.
*459 Entertaining the highest respect for the learning and ability of the learned judges whose opinions were referred to, we must yet do what they themselves felt obliged to do; and we proceed to examine this matter for ourselves.
Approaching the question therefore, as a new one, we are to enquire what was the object and scope of the invention secured to Schillinger by the patents relied on, as disclosed by his applications and the patents ■ themselves. Schillinger’s original patent was issued the 19th of July, 1870. On the 21st of the following May he claimed the benefit of the provisions of section 4916 of the Revised Statutes, which (omitting words unimportant here) declares that:
“Whenever any patent is inoperative or invalid by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had the right to claim as new; if the error has arisen by inadvertence, accident or mistake, and without any fraudulent or deceptive intention, the Commissioner shall, on the surrender of such patent and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the corrected specification to be issued to the patentee.
“ Every patent so reissued, together with the corrected specification, shall have the same effeckand operation in law on the trial, &c., as if the same had been originally filed in such corrected form, but no neto matter shall be introduced into this specification, &c.”
Notwithstanding the positive provisions of this statute, Schillinger admits that “ new matter ” was introduced into the amended specifications, and that the new patent was not for the same invention alone.
To avoid the consequence of this illegal enlargement of the patent, in February, 1875, he availed himself of another privilege given by section 4917 of the Revised Statutes, which declares (omitting words unimportant in this connection) that “ whenever, through inadvertence, accident or mistake, and without any fraudulent or deceptive intention, a patentee has claimed more than that of which *460 he was the original or first inventor or discoverer, his patent shall be valid for all that part which is truly and justly his own, provided the same is a material or substantial part of the thing patented; and any such patentee, &c., may, on payment of the fee, &c., make disclaimer of such parts of the thing patented as he shall not choose to claim or to hold by virtue of the patent, &c. Such disclaimer shall be in writing, attested, &c., and it shall thereafter be considered as part of the original specification to the extent of the interest possessed by the claimant, &c.”
There can be no doubt that the reissued patent, after the filing of the disclaimer, ceased to have any operation beyond the grant in the original patent; and that no omissions in the new specifications of expressions found in the original, and no addition in the new specifications of expressions not contained in the original, can have the effect to enlarge or to diminish the first grant. As all the decisions about this patent agree, Schillinger’s rights under the new patent, after the disclaimer, were the same as those under the first patent — no more and no less. But as it is construed by the complainant, he obtained as much by the first application as he would have done if it had been in the exact language of the second, and had explicitly included the new claim which was introduced for the first time in the second application.
It is therefore proper to examine the original specifications and patent with care. By section 4888 of the Revised Statutes of the United States it is provided (omitting words here unimportant): -
“Before any inventor shall receive a patent for his invention he shall file, with his written application to the Commissioner of Patents, a written description of the same, and of the manner and process of making, constructing, compounding and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it appertains or with which it is most nearly connected, to make, construct, compound and use the same; and in case of a machine he shall explain the principle *461 thereof, and the best mode in which he has contemplated applying that principle so as to distinguish it from other inventions; and he shall particularly point out and distinctly claim the part, improvement or combination which he claims as his invention or discovery.”
In compliance with this requirement, in the commencement of the original specifications, Schillinger declares that they “contain such full, clear and exact description of his invention as will enable those skilled in the art to make and use the same.”
He then proceeds to state in general terms, first, what his invention has relation to; second, what it consists of; third, the substance or material involved in its production; and fourth, the result designed as follows: “The invention relates to pavements for sidewalks arid other purposes.” “It consists, in combining with the joints of concrete pavement, strips of tar-paper, or other equivalent material, arranged between the several blocks in such manner as to produce a suitable tight joint and yet allow the blocks to be raised separately without affecting or injuring the blocks adjacent thereto.”
The substance or materials required are said to be, first, tar-paper in strips or its equivalent; and second, blocks of concrete placed in juxtaposition. The combination of these articles is to be effected in the joints of the several blocks, and the result is the production of “a suitable tight joint.”
After this general statement he describes the particular method he adopts in carrying out his invention. The concrete is to be formed “by mixing cement with sand and gravel, or other suitable materials, to form a suitable plastic composition,” not confining himself to particular proportions in making the concrete composition. He proceeds:
“While the mass is plastic, I lay or spread the.same upon the foundation or bed of the pavement, either in molds or between movable joists of the proper thickness so as to form the edges of the concrete blocks a, a, &c. When the block a has been formed, I take strips of tar-paper, b, of a width equal, or almost equal, to the heighth of the block, *462 and place them np against the edges of the block in such manner that they form the joints between such block and the adjacent blocks. After completing one1 block, a, I place the tar-paper, b, along the edge where the next block is to be formed, and I put the plastic composition for such next block up against the tar-paper joint and proceed with the formation of the new block until it is completed. In this manner I proceed in making all the blocks until the pavement is completed, interposing tar-paper between their several joints as described.”
He then states in detail the result:
“The paper constitutes a tight, water-proof joint; but it allows the several blocks to heave separately from the effects of frost, or to be raised or removed separately, whenever occasion may arise, without injury to the adjacent blocks. The paper does not adhere when placed against the edge of the fully formed block, and therefore the joints are always free between the several blocks, although adherence may take place between the paper and the plastic edges of the blocks which are formed after the paper joints are set up in place.”
And he concludes with this statement of the extent of his invention:
“ What I claim as new, and desire to secure by letters patent, is:
“The arrangement of tar paper, or its equivalent, between adjoining blocks of concrete, substantially as and for the purpose described.”
It seems plain to us that the only claim of Schillinger, as thus set forth in his specification, was to a combination, which would furnish a complete and efficient method of separating adjoining blocks of concrete, by the simple expedient of interposing strips of tar paper, or of some equivalent material, between the joints of the adjacent blocks; and that no further invention had suggested itself to him up to that time.
To the extent of his claim, thus defined by himself, the United States granted him an exclusive right of manufacture, which none could exercise without the purchase of the *463 privilege, and which could not be infringed without reparation. If he had then made good his claim to more he might equally have received an enlarged privilege. But he obtained at that time all he claimed. One seeking a monopoly, which for seventeen years is to levy a tax upon the whole country, for the use of a device which may occur to many others many times during the life of the monopoly, but who are forbidden to use their invention because a patentee has outstripped them, may surely be required to use plain terms that plain people maybe able to understand, explaining what it is he claims to have invented. The purchaser of a right under the patent is entitled to find in the specification a full, clear, concise and exact description of the invention, to enable him to make, construct, compound and use the same; and the patentee declared that he had furnished such description. It is also held by the authorities that the further object of the specification is that after the expiration of the term the public shall have the benefit of the invention. 2 G-reenl. on Ev., sec. 490.
It is insisted, however by the complainants, that within the terms of the re-issued patent are contained claims greatly more comprehensive than the one we have found allowed in the original.
First. It is said that any substance which may he interposed between the adjacent blocks is the equivalent of the tar paper; and particularly that the interposition of a portion of the concrete of which the blocks are made, or of a mixture of cement and sand used as the surface coat and formed of a composition different from that suggested by Schillinger, would constitute an infringement.
Second. That the interposing substance need not be left permanently between the blocks, but that the temporary insertion of an instrument, as an iron trowel, between the separate blocks would be an infringement.
Third. That the patent would be infringed simply by'the running of a marker to the depth of part of an inch through to a coat of cement and sand and laid on top. of a layer of concrete, provided the effect of the mark would be *464 to control tbe cracks and prevent them from running from one block into another, or would enable the separate blocks to be taken up without any or with less injury to the adjacent blocks.
And, finally, that the patent comprehended the formation of sections or separate blocks of concrete on the ground, which could be taken up without injuring the adjoining blocks.
Are these claims, or is either of them, justly within the scope of the original specifications and j^atent?
First; the language of the patentee in describing the mode of making and using the invention seems to exclude the idea that concrete composed of sand, cement and gravel, or other suitable material, could have been in his mind as a possible equivalent of the tar paper.
Examining this description we find that whatever may be the equivalent of the tar paper is to be “arranged” or “interposed” between the blocks; implying a fixing with design, and not the chance falling of the substance into the crevices. The substance must be in “strips” or in some equivalent form, according to the fair construction of the language, and must, therefore, be of a composition capable of assuming such form; for the workman has “to take strips” of a proportionate width about equal to the height of the block, and “to place them [the strips] up against the edges of the block in such a manner that they [the strips] form the joints,” &c., and the tar paper, or its equivalent, then “constitutes a tight, waterproof joint,” which “does not adhere when placed against the edge of the fully formed block,” but may adhere “to the plastic edges of the blocks, which are formed after tar paper joints [or joints- of the equivalent substance] are set up in place.”
Not one of these methods is practicable, if concrete or cement and sand, are substituted for the tar paper. These materials cannot be made into strips or equivalent forms, or be arranged in the mode specified. The concrete necessarily containing gravel or similar hard substances, could not well be pushed into the narrow crevice only wide enough to be *465 filled by the thin paper; nor could either substance make a tight waterproof joint.
According to the explicit declaration of the patentee, immediately upon the formation of the first block and before it can harden, he puts the plastic composition for the next block up against the tar-paper joint. This does not contemplate the existence of any gap or crevice requiring anything to fill it up, as the new block is built directly against the old one ; without any such delay as occurs, in the Cranford method which huilds the blocks in alternate subdivisions, the blocks in the first and third subdivisions being formed before those in the second or intervening subdivision are begun.
The drawings accompanying the specifications and which by law form part of it, would suggest to no one inspecting them the idea of separating the blocks as they are made, either by concrete or by cement and sand, or by the blade of a trowel only temporarily interposed. The interposed substance is there delineated as forming a permanent part of the pavement, as much as the blocks themselves, although as a -very narrow strip.
But even if the gravel concrete could be made fine enough to be then pushed into the crevice between the old and the new block, as it would be no older than that forming the new block, it would be equally soft and plastic. It would not, therefore, constitute an intervening substance of a consistency or adhesiveness different from the substance of the new block, and it would practically form the selvage of that block. It would adhere to the old block just as fully as the rest of the new block would have adhered to it; and there would thus be nothing gained by the interposition of a portion of the concrete, separated from the new block, that would not result from the juxtaposition of the new bjock itself formed of the identical material.
As respects the mixture of sand and cement used by Cranford as a top course, the specifications of Schillinger nowhere allude to it; hut, on the contrary, from the beginning to the end, Schillinger speaks of no other plastic com *466 position than concrete. This is a combination which has been perfectly well known in the arts for more than two thousand years; which cannot be formed of sand and cement alone, but is composed of those substances mixed with gravel or pebbles or fragments of stones; or of pottery, as mentioned by Pliny. The composition spoken of by Schillinger is homogeneous throughout, with as much gravel at the top as at the bottom or center of the mass; and a stratum of sand and cement at the top is no more contemplated than a stratum of sand and gravel, or of cement and gravel.
In our opinion the “ equivalent ” contemplated by Schillinger was some flexible or manageable substance, such as tin-foil (which was properly held to be an infringement by Judge Shipman and enjoined as such in the case, reported in the 14th Blatchford), or such other similar material as reasonably admits of the manipulation described by the patentee.
Second. The idea that the temporary interposition of an iron trowel is such an equivalent seems still less tenable. The strips, as long as they were used at all (see Oreecy's testimony, p. 6), were left in the joints. The equivalent contemplated was to be something, according to the specifications, which was to be “arranged between the several blocks in such manner as to produce a suitable tight joint” — “which will constitute a tight water-proof joint.” it is spoken of as “a material” equivalent to tar-paper, which is a description of a substance or matter out of which an article is formed (as the materials of a building), but not of an article itself, like a trowel, the product of a material.
If the contention be correct that the patent included the monopoly to form separate and movable blocks on the ground, then such formation would be an infringement whether made with one tool or another, and the use of the trowel would be objectionable, but not because it is the equivalent of tar-paper.
Third. Neither specification contains the slightest intimation that it ever occurred to the patentee that it was important to control the cracks in the blocks and prevent *467 them from running into the adjoining blocks, or that the patent was ever designed to effect that object. The entire statement about the cracks, as a separate point of importance, is an evident afterthought, which seems never to have suggested itself to Schillinger until after both specifications had been filed. As distinguished from the larger pretension of the monopoly — to make separate blocks — the pretension as to the control of the cracks has no existence in any of the claims connected with the patent.
Fourth. The most important contention of the complainants is the last; that the patent includes the formation of separate blocks of concrete on the ground, which can be taken up without injuring the adjacent blocks whether they are separated by tar-paper or its equivalent or by anything else.
It seems strange that the patentee, if he had this claim in his mind when he was making his first specifications, should have suppressed it, and only made a distinct claim to the combination in the joints of the several blocks of the strips of tar-paper or of its equivalent. Nothing could have been simpler than to have presented the claim. It is not pretended that this was done directly, but only that hidden within the other claim, is this one of overshadowing importance, which is only to be gathered from the lesser one by inference.
The first reference to this quality of the blocks or sections, is in the paragraph which states that his invention consists “in combining with the joints of concrete pavement strips of tar-paper, or equivalent material, arranged between the several blocks in such manner as to produce a suitable tight joint, and yet allow the blocks to be raised separately without affecting or injuring the blocks adjacent thereto.” The statement assumes the existence of distinct blocks and their consequent separability. To say that separate blocks of concrete may be moved separately is as complete a truism in mechanics as to say that the bricks in a pavement may be taken up separately.
But he does not claim that quality as a new one then *468 first invented by bim. He says his purpose is to combine with the joints of the several blocks, strips of tar-paper. But he no more claims to have originated one of the factors of the combination than the other. He does not claim to have invented tar-paper. But no more does he claim to have invented the fabrication of separate blocks. He takes them both as he finds them and combines them by a simple •device. This combination he insists will produce “a tight joint,” “water-tight.” But, apparently unwilling to have it supposed that this joint is so closely united that it will destroy the natural separability of distinct blocks of concrete, he adds the precautionary words “and yet allow” (not that it will create or cause) but will continue to permit, the raising of the individual blocks without injuring the others.
In the same way, when the subject is again mentioned, it appears in the same connection as a denial that this efficient improvement or arrangement will make the joint so tight as to impair the movability of the blocks; and he therefore again insists, as we construe his language, that, effective as the tar-paper may be to make the joint even water-tight, still the quality of separability, necessarily belonging to distinct blocks when not placed so closely together, will remain with the blocks when divided only by a thin sheet of tar-paper. “But it allows the several blocks to heave separately from the effects of frost, or to be raised or removed separately, whenever occasion may arise, without injury to the adjacent blocks.” And in the next sentence he undertakes to justify this assertion by giving the reason why the adherence of the different separate blocks would not take place. “The paper does not adhere when placed against the edge of the fully formed block, and therefore the joints are always free between the several blocks, although adherence may take place between the paper and the plastic edges of the blocks which are formed after the paper joints are set up in place.”
He alludes to this quality in separate blocks as he does to the common method of making concrete, which he ex *469 plains at length, though known centuries ago. But he no more claims to have invented the one than he does the other. It seems to us that the language of Mr. Justice Woods in 114 U. S. Reports, p. 452, the case of The Western Electric Telegraph Company against Ansonia Company, is strikingly appropriate to this case. He says:
“ But clearly a patentee cannot claim the benefit of an element of his invention thus vaguely hinted at. * * * If he intended to include the cooling he has failed to describe it. Instead of describing the process he mentions the quality of it, and asks the court to infer the process from that quality. Such a vague and inverted method of description is not a compliance with the statutes. * * * It has been held by this court that “ the scope of letters-patent should be limited to the invention covered by the claim, and though the claim may be illustrated, it cannot be enlarged by the language in other parts of "the specifications. R. R. Co. vs. Mellen, 164 U. S., 112. The element of the process under consideration cannot, therefore, be held to be covered by the patent. The contention that the patentee intended to include it in his process is-evidently an afterthought.”
We have been examining the question thus far with respect to the first specification and patent alone. It is proper to consider the effect of the new specifications and the reissue in connection with the disclaimer.
We are satisfied that no question as to the charge of fraud on the part of the patentee in obtaining the reissue can be considered in this action. But it is competent for the court to examine whether the reissue comprehends a new invention, and if it shall find such to be the case, to pronounce such new grant void.
In this case, as we have seen, the patentee admits that the reissue did include a claim not within the first patent, and by his disclaimer he expressly professed to renounce it. If the disclaimer was broad enough to withdraw every portion of the new claim, then nothing remains in the new patent except what was contained in- the first issue.
*470 If the disclaimer is not in fact as comprehensive as it was intended to be, so that any part of the new invention inheres in the reissue, then such part of the new matter is valueless and void.
The new matter introduced into the second specification, if it relates to the new invention and was introduced to illustrate and explain such new claim, must be discarded with the new invention itself, for the statute which requires that the reissue shall be only “for the same invention,” is equally explicit in declaring that “no new matter shall be introduced into the (new) specification.” Section 4916 Revised Statutes.
Only so far as the new matter can be fairly considered as introduced to explain and illustrate the first invention, apart from the new claim, should it be looked to in examining the extent and scope of the old claim. This would only leave properly for consideration any such explanations or illustrations as the patentee would have set forth originally in his application for the first patent, had he not omitted to do so “by inadvertence, accident or mistake, and without any fraudulent or deceptive intention.” Section 4916.
"Unless the operation of the new matter were to be thus limited, the patentee, under the new specifications, might obtain practically the benefit of the new invention which he has been compelled to abandon as void, by strengthen-, ing the old claim with statements only properly belonging to the new one, and which would never have been set out at all if the new claim had not been presented.
The new specifications contained an additional claim in these words:
1. A concrete pavement, laid in detached blocks or sections, substantially in the manner shown and described.”
The manner in which this concrete pavement is laid is shown and described in the new matter introduced into the amended specifications.
The first paragraph following the reference to the drawings (which are substantially identical with those accompanying the first specifications) is in these words:
*471 “This invention relates to a concrete pavement which is laid in sections so that each section can be taken np and relaid without disturbing the adjoining sections. In the joints of this sectional concrete pavement are combined strips of tar-paper or equivalent material arranged between the several blocks or sections in such a manner as to produce a suitable tight joint, and yet allow the blocks adjacent thereto to be removed,” &c.
For the words in the corresponding paragraph in the original “this invention relates to pavements for sidewalks and other purposes,” are substituted these words in the new specification:
“This invention relates to a concrete pavement which is laid in sections, so that each section can be taken up and relaid without disturbing the adjoining section.”
And for the words “and consists in combining with the joints of concrete pavement strips of tar-paper,” are substituted “with the joints of this sectional concrete pavement are combined strips of tar-paper;” and the words “or sections” are introduced further on after the word “blocks” in the original.
In the next paragraph, describing his manner of carrying out his invention, he inserts that he does not confine himself to any “definite ” proportions or materials for making the concrete composition, and also these sentences:
“ — one block being formed after the other. When the first block has set I remove the joist or partitions between it and the block next to be formed, and then I form a second block and so on, each succeeding block being formed after the adjacent blocks have set. And since the concrete in setting shrinks, the second block when set does not adhere to the first, and so on; and when the pavement is completed each block can be taken up independent of the adjoining blocks. Between the joints of the adjacent blocks are placed strips b of tar-paper or other suitable material in the following manner:
“For the sentence in the original:
“ The paper does not adhere when placed against the *472 edge of the fully formed block, and therefore the joints are always free between the several blocks, although adherence may take place between the paper and" the plastic edges of the blocks which are formed after the paper joints are set up in place.”
—is substituted this:
“ The paper, when placed against the block first formed, does not adhere thereto, and therefore the joints are always free between the several blocks, although the paper may adhere to the edges of the block or blocks formed after the same has been set up in its place between the joints.”
And he appends, at this point, this final and additional paragraph of which there is no counterpart in the original: “In such cases, however, when cheapness is an object, the tar-paper may be omitted, and the blocks formed without interposing anything between their joints as previously described. In this latter case the joints soon fill up with sand or dust, and the pavement is rendered sufficiently tight for many purposes while the blocks are detached from each other and can be taken up and relaid each independent of the adjoining blocks.”
In our opinion scarcely any word of the new or altered parts of the specifications can properly be said to relate to the original claim. They were manifestly introduced to describe and explain the alleged new invention and never would have been presented but for the patentee’s anxiety to secure that. It certainly, for example, would have been an extraordinary act of frankness for a patentee, in his application for the first patent (which we understand as comprehending only the combination of strips of tar-paper, or its equivalent, with separate concrete blocks), to have stated, as is done in the last paragraph of the new specification, that the tar-paper may be omitted where cheapness is an object, and that a sufficiently tight joint can be procured without interposing the particular material especially pointed out in the patent, or “ anything ” between the joints.
Discarding these new features of the specifications from the present inquiry, as not germane to the first patent, but *473 applicable solely to the second and invalid claim, we find what remains of the second specification to be merely a reiteration of all that is properly claimed in the first. In slightly changed language the improvement is still claimed as a combination. The use of the strips of tar-paper or equivalent material is still insisted on as making a water-proof joint; for the last paragraph which claimed for the first time that a “ sufficiently tight ” joint might be made by the fillings of sand or dust from the pavement, is distinctly withdrawn and obliterated from the specification bj the disclaimer ; and there is an entire absence of any expression tending to enlarge the range of equivalents for the selected material, which is described and ear-marked anew in words and on the plans in the same manner.
And while the new claim is a clear admission that the first patent conferred no monopoly in respect to the formation of separate blocks on the ground, and that he could only obtain that privilege by an enlarged invention, the language of the disclaimer practically admits that if that claim had been insisted on when the first application was made it could not have been sustained.
In the last specification the quality of separability is studiously included as the new claim and constitutes its distinctive and valuable feature; and this quality the patentee proposed to utilize only under the new claim.
But in 1875 he filed with the Commissioner the following disclaimer to portions of the reissue No. 4369, in which he set forth:
“ That he has reason to believe that through inadvertence, accident or mistake, the specification and claim of letters-patent are too broad, including that of which your petitioner was not the first inventor; and he, therefore, hereby enters his disclaimer to the following words : “ and since the concrete in setting shrinks, the second block when set does not adhere to the first, and so on,” and which occur near the middle part of said specification: and to the following words near the end of the specification : “ In such cases, however, where cheapness is an object, the tar-paper *474 may be omitted, and the blocks formed without interposing anything between their joints, as previously described. In this latter case the joints soon fill up with sand or dust, and the pavement is rendered sufficiently tight for many purposes, while the blocks are detached from each other and can be taken up and relaid each independent of the adjoining blocks.” “Your petitioner hereby disclaims the forming of blocks from plastic material without interposing anything between their joints while in the process of formation.”
By this disclaimer he necessarily admitted that the public had the right to form the blocks alongside of each other on the ground; for in no other way could joints appear in the process of formation. Separate blocks made away from the pavement, like bricks at a brick-kiln, could have no joints in the sense referred to. In the language of Judge Blatchford, in 15th Blatchford, 152, Schillinger vs. Gunther, “It was not new to lay concrete pavements in sections. The plaintiff, after this suit was brought, filed a disclaimer, disclaiming any claim merely to the laying of a concrete pavement in detached blocks or sections without the interposition between the blocks or sections of the tar-paper or its equivalent, and admitting that it was not new to lay a concrete pavement in sections.” And again, “ nothing is claimed as new in respect of this,” &c.
It is difficult to understand how the successive blocks could be formed without the interposition of something between the parts of the material designed to constitute the respective blocks. It is essential to the formation of the edges and joints that something should be introduced between the selected masses, harder than' the material itself, or that pressure should be applied to retain the respective masses within the desired limits. This may be done by the hand of the workman, or by an instrument of wood or metal, as by a metal or wooden trowel or spade. It would be but a useless privilege to allow the workman to make the separate blocks and yet deny to him the right to use appropriate tools to form them. And having the *475 right to form them, he had the right to form them at such distance apart as should suit himself; and to preserve their separability while presenting the advantages of an unbroken pavement in any effectual manner, provided he did not infringe upon the device of Schillinger.
We see nothing, therefore, in the new specifications, when construed with the disclaimer, to change our opinion that the several claims of the complainants we have been considering are untenable ; and hence we are forced to the conclusion that the pavements laid down by Cranford, as shown by the evidence in this cause, are not infringements of the Schillinger patent.
Each suit for infringement is to be tried upon the evidence produced in that case. It can only be some legal, or some important and well-established mechanical principle which can be imported from one case into another with controlling influence. Each individual suitor is entitled to have his suit tried only on the evidence adduced against him in his own case. As there is no such evidence before us of the state of the art at the date of Schillinger’s patent as shows that what he was claiming was then unknown; we cannot acccept the statements in law books that such evidence was offered in certain other cases as conclusive of the rights of the suitors in this cause.
Nor can we say that we are satisfied from the voluminous proofs in this case that the quality of separability imputed to Cranford’s work by the complainants has been attained. The evidence is not satisfactory on the point, though the fact that Cranford’s imitation of Schillinger (if shown to exist) has proved to be a bungling one in this particular, would not exculpate him from the charge of infringement if the complainants’ construction of the patent were the correct one.
Schillinger, throughout all his claims, specifies “ concrete ” as one of the elements of his combination — a specific composition as old as the mechanic arts, possessing distinct properties. By his process he makes one block, instantly places along its edge the tar-paper or its equivalent mate *476 rial, and forthwith pushes against the material thus placed in position a further, quantity of the concrete to form the succeeding block. There is neither an interval of time or distance required. Whatever is to be interposed prevents the formation of a coherent mass, which, by virtue of the thing interposed, becomes two blocks instead of one block of twice the size.
In this mode of fabrication there can be no room for filling up a gap artificially made, or for making such a gap with a cutting instrument. Cutting such a gap presupposes that the two blocks of concrete had become united, which it was Schillinger’s design to prevent. As described in the specification, as soon as Schillinger has built the successive blocks, with the tar paper or equivalent material interposed at the time, he has completed his pavement, in separate blocks, with waterproof joints, each block a homogeneous mass, with the gravel or similar hard substance of the concrete appearing in the texture of the surface. He has no need of a mixture of cement and sand, or for a trowel or a similar implement, and there is no possibility of using either, if the process he has described has been followed.
Cranford spreads the concrete across the bed of the pavement and drives the cleaver down into it at regular distances, and he has then a concrete pavement of disjoined blocks, which he has a right to make, formed by cutting across the sfibdivisions with the cleaver. As a concrete pavement, it is complete, though it is an inferior one, with crevices between the blocks. But his pavement is not designed to be a pavement of concrete alone; and it would be incomplete without a top coat of the plastic of cement and sand and water, and he proceeds to finish it by putting on that top coat.
In the process necessarily some portion of this substance sinks into the gaps below ; and he cuts corresponding lines through the upper surface with a trowel, and marks the lines again with a jointer. If either the cement and sand, or the trowel, or the jointer thus temporarily interposed, were the equivalent of the tar paper when applied *477 to a concrete pavement, in the combination, would such be the case when applied to a different pavement, not homogeneous throughout, like the concrete pavement of Schillinger.
The general principle of the patent law is, that “the omission of one ingredient of a combination covered by any claim of a patent averts any charge of infringement based on that claim. A combination is an entirety. If one of the elements be omitted the thing claimed disappears. Every part of the combination claimed is conclusively presumed to be material to the combination, and no evidence to the contrary is admissible in any case of alleged infringement.” Walker on Patents, sec. 349; Vance vs. Campbell, 1 Black, 430.
Again, in the same connection, “where a patentee states in his specification that a particular part of his invention is to be constructed of a particular material, and states or implies that he does not contemplate any other material as being suitable for the purpose, it is not certain that any other material will be treated by the court as the equivalent of the one recommended by the patent.” Walker, sec. 349.
The language of the Supreme Court in Sargent vs. Hall Safe and Lock Co., 114 U. S., 86, is in the same direction:
“In patents for combinations of mechanisms, limitations and provisos imposed by the inventor, especially such as were introduced into an application after it had been persistently rejected, must be strictly construed against the inventor, and in favor of the public, and looked upon as in the nature of disclaimers. As was said in Fay vs. Cordesman, 109 U. S., 408, 420: ‘The claims of the patents sued on in this case are claims for combinations. In such a claim, if the patentee specifies any element as entering into the combination, either directly by the language of the claim, or by such a reference to the descriptive part of the specification as carries such element into the claim, he makes such element material to the combination, and the court cannot declare it to be immaterial. It is his province to make his *478 own claim, and Ms privilege to restrict it. If it be a claim to a combination, and be restricted to specified elements, all must be regarded as material, leavi ng open ouly the question whether an omitted part is supplied by an equivalent device or instrumentality/ ”
In the words of the court in Gould vs. Rees, 15 Wallace, 187:
“Where the defendant, in constructing his machine, omits entirely one of the ingredients of the plaintiff's combination, without substituting any other, in the place of the one omitted, which is new or which performs a substantially different function, or if it is old, was not known at the date of the plaintiff's invention as a proper substitute for the omitted ingredient, then he does not infringe.”
According to our view Cranford’s alleged “equivalent” performs an altogether different function from that designed to be performed by the strip of tar paper or equivalent material. Schillinger introduced the tar paper to make a tight waterproof joint and yet allow the concrete blocks he makes to move separately; while Cranford’s blocks of concrete are already separate but too far apart for a-neat pavement, and what he superadds has the effect to diminish the-distance between them by filling the gap with the cement and sand. While forming what he claims is a smoother and better pavement, Schillinger.admits, in the second specification, that the gaps between the separate blocks maybe filled with sand and dust from the pavement without infringement. Why not with sand and cement?
We have examined the cases referred to, and all others which were accessible sustaining Schillinger’s pretensions, and have been duly impressed with the weight of those authorities. But we have, notwithstanding, found ourselves unable to acquiesce in their conclusions, and the opinions formed separately by each of the judges joining in this* judgment, have been strengthened by examination and consultation.
The first decision in order of time is that reported in 14th Blatchford, 152, Schillinger vs. Gunther, made by Judge *479 Shipman of the southern district of New York in February, 1877. An injunction had been issued to restrain the manufacture of pavements where tin foil had been substituted between the joints in lieu of tarpaper; which the court held was clearly an infringement; and the case had been referred to a master for an account. Afterwards an application was made by the complainant for an attachment for contempt, alleging that the defendant was dividing the blocks by the temporary interposition of a trowel through the entire pavement. The court decided in favor of the complainant on the application for the attachment, and not upon a new bill; which latter course, in the language of the Supreme Court, in California Paving Co. vs. Molitor, 113 U. S., 618, “Is by far the most appropriate method where it is really a doubtful question whether the new process adopted is an infringement or not.”
The same case came on again in October, 1878, before Judge Blatchford, as circuit judge, upon exceptions to the master’s report (15th Blatchford, 303). The only points stated in the head note of the decision as settled in that case, relate to the mode of estimating the damages. But although the learned justice discussed to some extent the features of the patent, the case cannot he considered as a distinct affirmance of the general doctrine laid down by Judge Shipman on allowing the attachment. Indeed portions of the opinion (among others, those parts we have quoted above) would rather seem to be in opposition to the contention of the patentee.
In August, 1879, a case between the same parties was again before Judge Blatchford (17th Blatchford, 66). The head note of the case, prepared by the judge the reporter, or under his direction, states that the points decided were, that a concrete, pavement made where it is to be laid, is not anticipated by a pavement made of similar blocks made elsewhere and then laid where they are to be used; and further, that the several objections interposed in that case to the efficiency and regularity of the disclaimer were untenable; but the learned judge states in *480 the opinion, that the question of infringement by the use of a trowel or knife had been disposed of by Judge Ship-man in that case.
In May, 1881, Justice Sawyer, of the California circuit decided the cases of The California Artificial Stone Co. vs. Molitor and Perine, 7 Sawyer, 190. The complainants were the assignees of the Schillinger patent and sued for an infringement.
The learned judge commences with the statement that the patent had been before him on several occasions, and he had experienced considerable difficulty in giving it a satisfactory construction; that it had been before Judges Blatchford and Shipman at various times, and that they had given it a construction wider in its scope than he thought, on first examination, it would bear. Expressing his reluctance to dissent from those distinguished jurists, and, as it seems to us, very much in deference to their decisions, he delivers an elaborate opinion sustaining the essential features of the complainants’ claims as presented in the present case.
In the southern district of Ohio, Judge Sage decided (in Kuhl vs. Meuller, 21st Federal Reporter, 510), that the patent was infringed by a construction where the cement was laid in a solid mass and the surface was marked off by a fish line or trowel, into blocks. But he appears entirely to base his decision upon those of Judges Shipman and Blatchford, and the first decision of Judge Sawyer.'
In July, 1883, Judge Blatchford again had the patent under consideration in 21 Blarchford, 383, Schillinger vs. Greenway Brewing Co. He refers to the former decision in the Gunther case and to the case in 7th Sawyer, and decides distinctly that the pavement of the defendant there complained of, and which was laid substantially as Cranford lays his, is an infringement.
Judge Blodgett, of the southern district of Illinois, in the case of Schillinger vs. Hurlburt, adopts the decisions before referred to in a esse where he states the facts are similar ; although he says if the question were before him *481 as an original one he would have great doubts of its validity on the ground of novelty.
These are all the decisions we have found sustaining the patent. If there are others they have not been placed before us, or discovered in our researches. '
On the other hand we have been referred to the case of Schillinger vs. Weber, decided in May, 1879, by Judge McKennan, circuit judge for Pennsylvania. The defendant’s process, as appears from his answer, was substantially the same as that pursued by Cranford, although there were some unimportant differences as to the material and its manipulation. The judge refused an injunction and dismissed the bill, thus denying that the defendant was guilty of infringement.
To the same effect was the decision of Judge Butler, of the eastern district of Pennsylvania, in the case of the Vulcanite Paving Co. vs. Keystone Artificial Pavement Co., and Krause and others. Unfortunately no written opinion was given in either case, and there have only been produced before us the statements of counsel engaged on both sides of the cases explaining the grounds of the decisions. We understand the judges construed the patent as we have done; and held further that if it were designed only to comprehend the separation of blocks, on the ground, the patent would be void for want of novelty.
The patent was again before Judge Sawyer in January, 1883, in the case of the California Stone Co. vs. Freeborn, reported in 8th Sawyer, 443. In that case the judge adhered to his decision in 7th Sawyer, which, as we read it, evinced rather a yielding to the authority of the New York cases than the abandonment of his own original opinion as to the extent of the patent. But he proceeds to say: “It is claimed that running the marker along the line between the old and new-blocks on the surface after forming the latter is an infringement. I am not able to take that view. I have gone as far in that direction as I think the pate nt will justify. I think in that particular it is not an infringement. Counsel for complainant have made a point *482 as to simply marking lines upon the surface, of the block with the marker employed. There is one case wherein it' is held that marking the surface with a fish line is an infringement. It is insisted by complainant that marking off the blocks on the surface at the time of laying the pavement with a marker about one-sixteenth of an inch in depth is an infringement. I am unable to perceive that the running along the surface of that blunt and rounded marker one-sixteenth of an inch in depth, there being no cutting elsewhere in making a joint, — I fail to see that that is an infringement.”
It seems to us this language evinces a disposition on the part of the learned judge to return to his own original conception of the proper restricted scope of the patent, and his ruling in the case last referred to is much within the wide claim made for the patentee in the argument before us.
The only case in which this patent has been before the Supreme Court of the United States is reported in 113 U. S., 609., California Paving Co. vs. Molitor.
After the decree in 7th Sawyer, an application had been made to the California court for an attachment for an alleged violation of the injunction. The breach consisted, as stated by Mr. Justice Bradley, “in making a mark or indentation on the surface whilst in a plastic state with a trowel or marker, extending to the depth of from one-eighth of an inch to an inch, and thus giving the pavement the appearance of being made in detached blocks, and, in fact, answering all the purposes of detached blocks, the crease on the surface being sufficient to produce the results obtained by the Schillinger patent. Of course,” continues Judge Bradley, “the question was at once raised whether the process now used by the defendant was an infringement of the patent. The judges being opposed in opinion, a decree was made in conformity with that of the circuit judge, declaring that the pavements thus constructed by the defendant did not infringe the patent;' that there was no violation of the injunction, and that the order to show cause be discharged.”
This application had been made more than two years after *483 the decree in 7th Sawyer and nearly a year after the decision in 8th Sawyer, and we find the circuit judge in conformity, or we think, with the disposition evinced in his judgment in 8th Sawyer, now holding that to be no infringement, which the Schillinger assignees were insisting was a clear breach of the injunction. From this decree Schillinger’s assignees appealed. In the Supreme Court a motion was made to dismiss the appeal, which was granted, the court saying:
“Whether the new pavement, constructed in Redwood City, is an infringement or not, is just as much a mixed question of law and fact (as the case is presented to us) as was the question whether the pavement formerly constructed by the defendant was an infringement. It is a question which the Circuit Court must decide for itself in the ordinary way. If the judges disagree there can be no judgment of contempt and the defendant must be discharged. The complainant may then either seek a review of that decision in this court, or bring a new suit against the defendant for the' alleged infringement. The latter method is by far the most appropriate where it is really a doubtful question whether the new process adopted is an infringement or not.”
If the Supreme Court had considered Schillinger’s construction of the patent as res judicata under the New York decisions, it seems more than probable it would have put a stop to further litigation by saying so (for this point seems to have been earnestly insisted on before it), instead of suggesting an appeal, or a new suit, to settle the extent of the patent.
The two cases referred to by the complainant as decided in this court cannot be regarded as authority. They were brought and settled before the disclaimer was filed; and moreover it is apparent they were not really contested. Creecy, in his evidence before us, states that one of the defendants in one of the cases afterwards joined in the Schillinger enterprise; which the witness relies on as an admission by that defendant of the validity of Schillinger’s claim. *484 But this act may equally be considered as evincive of collusion to obtain a favorable decision for a confederate, after a feeble show of defence.
It has been urged by the defendant that the patent should not be sustained for want of patentable novelty.
If the proper scope and object of the patent had really been only to secure a monopoly to divide the concrete mass on the pavement into separate blocks, so that they might be moved without disturbing the adjoining blocks, and to prevent the spreading of cracks, by the intervening joints, we are disposed to agree with Judge Blodgett that the claim would not present the feature of a novel and useful invention.
A workman may complete the separation of his material into paving blocks at his workshop, whether that be distant from the place to be paved or very near it; and why not make the separation on the pavement itself? If he sees fit to spread the entire mass in a layer of proper depth across the space to be paved, we see no reason why he may not, undisturbed by any patent, subdivide the mass on the ground into two, or fifty, sections or blocks, as may suit his fancy, by any suitable instruments.
But if the instrument used is thin, and the mass is soft, the chances are that the blocks would reunite. On thb other hand, if the consistence is stiffer and the instrument wide, the gaps might remain open; and a wide opening would expose the blocks to disintegration from the rain and frost. It would readily occur to the workman to guard against both those dangers by the interposition of- a substance that would keep the blocks apart when severed, while forming a tight joint. But any ordinary and cheap material, like strips of wood, would soon decay and shrink, and thus leave a rough pavement; while the use of more lasting substances, such as a line of bricks on edge, or a strip of stone, or thin strips of metal (even if the plastic material should adhere to them with sufficient closeness to make a tight joint), would prove too expensive for popular use. And while either of these plans would equally “ allow ” the *485 blocks to be moved separately, and prevent the spreading of cracks, it seems hard to say that either would present a patentable novelty or any feature of a useful invention.
But if the patent of Schillinger is to be construed as we have concluded it should be, we recognize in it a novel and useful device which, by anv easy and simple method, might overcome these difficulties that might arise from the separation of the blocks on the pavement in more obvious methods; viz., by the interposition of strips of tar-paper, so thin that there could be no such wide gap as would adfnit the rain; and to which the plastic material would sufficiently adhere, while indestructible and cheap enough to recommend its use.
The invasion of every department of life by the daily increasing number of unnecessary patents is becoming a serious tax upon the public. The amusing complaint of Sidney Smith of the universality of taxes in England may well be applied here to this grievance. From the safety pin of the new-born infant to the “ casket ” that receives the octogenarian, almost everything we use pays tribute to the patentee, and frequently for devices that might well suggest themselves to any quick-witted housewife or intelligent mechanic.
A justice of this court while recently announcing an opinion overruling an application for a proposed highly important improvement in the method of lengthening and shortening the cords for hanging pictures, read his notes from a patented paper-pad, written with a patented pencil; while the ink, pens, penholder and block of india rubber before him, all bore the mark of patentees. Several articles of his clothing were also patented, down to the hem of his garments, which were bound by strips of gutta percha, duly patented. And these probably were but a small part of the articles in the room thus paying a duty- to patentees.
The courts have been admonished by the decisions of the Supreme Court in the Slawson Fare box case, and in many others similar in character, that the proper policy of the law is to limit rather than to amplify the extent of such *486 claims, and this consideration has not been without influence in our examination of this subject.
It is unnecessary to add the observations made when the decision was announced, upon other points argued before us.
In our opinion the decree below should be reversed, and it is so ordered.